# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

IN RE:

F.B.,

MINOR CHILD

---

### OPINION AND JUDGMENT ENTRY
### Case No. 17 BE 0034

---

Civil Appeal from the
Court of Common Pleas, Juvenile Division of Belmont County, Ohio
Case No. 10 JG 714

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Michael J. Shaheen*, and
*Atty. Alaire Mancz*, Shaheen Law Group, P.O. Box 579, Saint Clairsville, Ohio 43950,
for Appellee

*Atty. Elgine Heceta McArdle*, McArdle Law Office, 2139 Market Street, Wheeling, West
Virginia 26003, for Appellant.

Dated: June 22, 2018

---

**WAITE, J.**

{¶1} Appellant-father, K.D., challenges the judgment of the Belmont County

Court of Common Pleas, Juvenile Division, granting Appellee-mother S.T.'s motion to

suspend Appellant's visitation with the parties' minor child. Appellant argues the trial court effectively terminated his parental rights without reviewing the evidence using the clear and convincing standard. Appellant further contends the trial court erred in favoring one of three polygraph examinations of Appellant in making its determination. Finally, Appellant argues the trial court's judgment is against the manifest weight of the evidence. For the reasons expressed below, none of Appellant's arguments have merit. The trial court did not terminate his parental rights or issue a no-contact order. Instead, Appellant's visitation was modified and the trial court maintained continuing jurisdiction over the matter. Moreover, although the court did utilize the wrong statutory factors, the entirety of the trial court's judgment establishes that the court thoroughly and thoughtfully considered a multitude of facts which do comprise the proper visitation modification factors found in R.C. 3109.051(D). Therefore, the judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} The parties' minor child was born on November 5, 2009. The parties were never married but Appellant had DNA testing performed and paternity was established. Appellant had been exercising regular standard visitation until December of 2013. At that time, the child began behaving unusually after returning from Appellant's home. The child also made disturbing disclosures regarding sexual abuse which the child indicated took place while she was under Appellant's care. Initially, the child said that "Downtown" had "peed" on her and performed other lewd acts. The child did not identify "Downtown," but was clear that the incidents happened while she was with Appellant. In response, Appellee denied Appellant visitation with the child throughout January of

2014 and filed a motion to suspend Appellant's parenting time on January 10, 2014. The matter was set for a hearing on February 12, 2014. Appellant filed a motion in contempt on January 14, 2014, based on the denial of his parenting time. On January 16, 2014, Appellee filed a motion for immediate ex parte relief, seeking an immediate suspension of Appellant's parenting visitation. Accompanying Appellee's motion was an affidavit executed by Trina Palmer ("Palmer"), intake care manager with the Belmont County Department of Job and Family Services. In Palmer's affidavit she stated that she had interviewed the child and the child relayed instances of sexual abuse while with Appellant. Palmer stated that the child did not directly accuse Appellant of these acts but that Appellant was present and "did not protect the minor child." (1/16/14 Palmer Aff.) Palmer indicated she was concerned about the child's health and safety and recommended that it was in the child's best interest to suspend Appellant's visitation while the matter was investigated. On January 16, 2014, the trial court granted Appellee's motion for ex parte relief, noting Appellant could "request an immediate hearing" on the matter. Appellant filed a motion for an immediate hearing and the matter was set for January 31, 2014. Appellant subsequently withdrew his motion for an immediate hearing because the parties had worked out a temporary visitation arrangement, allowing the matter to proceed on the originally-scheduled February 12 hearing date. On February 12, 2014, the parties read a temporary agreement into the record, which contained the following relevant provisions: (1) Appellant would submit to a polygraph examination at the Belmont County Department of Job & Family Services, Children Services Division; and (2) Appellant would exercise alternating weekend

Case No. 17 BE 0034

visitation but only at paternal grandmother's home with paternal grandmother present during all visitation.

{¶3} On May 15, 2014, Appellee filed a motion for immediate ex parte relief, seeking suspension of Appellant's visitation. Accompanying Appellee's motion was an affidavit executed by Elizabeth Albert, LISW ("Albert"), a social worker who had conducted numerous therapy sessions with the minor child. According to Albert's affidavit, the child disclosed that the perpetrator of the alleged sexual abuse was her father, Appellant. Albert's clinical notes regarding the child's disclosures were attached to the motion. In the motion Appellee requested that a guardian ad litem ("GAL") be appointed. The trial court granted Appellee's motion on May 15, 2014, effective immediately. The court again stated that Appellant could request an immediate hearing. Counsel for Appellant filed a motion requesting an immediate hearing, which was set for June 6, 2014, and a GAL was appointed. Appellant's counsel filed a motion to withdraw as counsel, which was granted. Following a series of continuances requested by both parties and new counsel being obtained by both parties, a pretrial hearing was held on November 3, 2014. The GAL filed a report for pretrial. While there was no record made of the hearing, in the extensive report the GAL stated that the child, both parents, the child's stepfather, Albert, the paternal grandmother, paternal step-grandfather, Appellant's girlfriend and Appellant's employer were all interviewed. The GAL reviewed the child's therapy treatment notes and spoke with Palmer, the caseworker in the matter. After reviewing the background and summarizing each interview the GAL made the following recommendation:

It is my belief, as the GAL for [F.B.], that it is in her best interest to remain in the care and custody of her mother, [Mother]. Furthermore, based on information currently known to me, I would recommend that visitation by and between [Father] and his daughter continue to be placed on hold, but subject to the exception, discussed infra. It is clear to this GAL that something has occurred. [F.B.] has demonstrated time and time again during therapy sessions that she is over-sexualized. I have witnessed minor examples of this behavior during home visits wherein the child is rather demonstrative with her acts. Her knowledge appears to be far beyond that of children of a like age. It appears that something has occurred, ostensibly while in the care and control of the father, [Father]. Originally [F.B.] only identified the perpetrator as "Hunter" or "Downtown" and not as her father. This disclosure came later through therapy sessions at Southeast Health Care Services through various modes of assessment (art therapy/dolls/discussions etc).

(11/5/14 GAL Report, p. 10.)

**{¶4}** The GAL reviewed the extent of the child's behavior changes and fear of Appellant:

The alleged acts included "Downtown" peeing in her mouth. Although not identifying "Downtown" as her father, [the child] told the therapist that her dad calls her a "small fuck". During this period where visits were occurring with the father, her behaviors, upon returning home to the mother worsened. She began acting out by biting, hitting and sassing back to her

mother. She also exhibited anxiety with respect to upcoming visits with her father. These behaviors were reported to [Albert] by the mother but were also demonstrated by [the child] during sessions. * * * She told the therapist that she did not feel safe with her daddy and that "he lied to my face" saying he would sleep somewhere else but came to sleep with me. She again stated to the therapist that daddy calls me a "lil fuck" and Makes [sic] me keep secrets. By the end of March it was reported that [the child] had began [sic] peeing the bed again.

(11/5/14 GAL Report, p. 6.)

{¶5} The GAL as further noted:

In a [sic] April 22, 2014 therapy session she recounted that "hunter" touched me with his pee pee when Grandma was gone. It was during this time frame that [the child] was showing symptoms of emotional distress and began sleeping with her mother. During these sessions she began demonstrating a fear for her mother's safety and often checked on her mother during sessions. In a May 13, 2014 session, [the child] stated to the therapist and showed through art therapy by drawing Mr. Downtown's pee pee that "Mr. Downtown" peed in my mouth. She then, when playing with dolls, gives details of how "Downtown" took her clothes off, bit her ear, kissed my mouth, my pee pee and my butt. Then he peed in my mouth. [The child] then beats the male doll with the female doll expressing anger.

(11/5/14 GAL Report, p. 6.)

**{¶6}** The GAL concluded:

When viewed in its totality, all information available to this GAL would suggestion [sic] that the safety of [F.B.] is better served by temporarily remaining separated from her father. He may not have committed the alleged acts but [F.B.] has expressed fear of [Father] to this GAL and that cannot be ignored.

(11/5/14 GAL Report, p. 11.)

**{¶7}** A series of three full hearings were conducted in the matter. The first occurred on February 27, 2015, where testimony was heard from Mathew Speckman, ("Speckman"), an investigator with the Bureau of Criminal Investigations ("BCI") who had performed a polygraph examination of Appellant; Dallas Wolfe ("Wolfe") a private investigator hired by Appellant to conduct a polygraph examination of Appellant; and Bobby Miller, a psychiatrist hired by Appellant to conduct a psychiatric evaluation of Appellant.

**{¶8}** Between the first and second hearings, the GAL filed an updated report which included additional interviews. The GAL reiterated his recommendation that it was in the best interest of the minor child to remain in the care and custody of Appellee and that visitation between Appellant and his daughter not be permitted. The GAL noted that the child had suffered trauma that caused her fear. While the GAL recommended that the paternal grandmother have visitation with the child, he requested that Appellant not be present. He opined that as the minor child aged, reunification with Appellant may be possible if the paternal grandmother maintained a relationship, but that any current visitation between Appellant and the child should be prohibited.

Case No. 17 BE 0034

{¶9} The second hearing was held on April 17, 2015. Testimony was presented from Albert, Palmer and Amber McConnell, Appellant's girlfriend. The trial court also admitted transcripts of interviews between the child and her therapist, a deposition of Ryan Allar, a detective sergeant with the Belmont County Sheriff's Department, as well as therapy notes from the child's therapy sessions and text messages sent to Appellee from Appellant's girlfriend. These messages indicated that during the time Appellant had visits with the child he was living in a house with several friends where there was drug use and drinking.

{¶10} The final day of hearings was held on May 27, 2015, with testimony from Appellant, Appellee, the GAL, and the paternal grandmother.

{¶11} On June 30, 2016 the magistrate issued a lengthy decision and judgment entry containing findings of fact and conclusions of law. In this decision the magistrate determined: (1) three polygraph examinations were conducted with three different outcomes, however, the test which indicated deception was the only one subjected to a peer review and was the most reliable. That said, all the tests were given little evidential weight; (2) the GAL's recommendation was that the child's visitation with Appellant be suspended; (3) it was in the child's best interest that visitation with Appellant be suspended; (4) paternal grandmother's visitation should continue but with no contact between Appellant and the child. It is notable that while the judgment entry speaks to a "best interest" analysis, it actually contains discussion of factors found within R.C. 3109.04(F), and not the factors set forth in R.C. 3109.051(D), which will be addressed below.

{¶12} On January 13, 2017, Appellant filed objections to the magistrate's decision which were delayed due to the unavailability of the transcripts. Appellant contended that the magistrate had terminated Appellant's parental rights without finding that he sexually abused his child. Moreover, Appellant contended that the court should have considered that the child referred to several individuals as "daddy" and, thus, any reference to "daddy" by the child did not implicate Appellant. In her response to Appellant's objections, Appellee contended the evidence presented at the hearings demonstrated that the child had undergone trauma while under Appellant's care. Hence, it was in the child's best interest to suspend Appellant's visitation.

{¶13} The trial court issued a judgment entry on June 20, 2017, stating:

The Court has reviewed the record in this case, along with the transcript filed. The Court hereby denies the Objection and finds that the Magistrate's Decision is based on information and testimony provided to the Magistrate at the time of the hearing on May 27, 2015. The Court finds that the Magistrate's Decision is appropriate and affirms the same.

(6/20/17 J.E.)

{¶14} Appellant filed an appeal, however, we determined that, because the trial court's judgment entry merely adopted the decision of the magistrate and did not contain a reference to the court's own review, it did not amount to a final appealable order. We remanded the matter and on October 3, 2017, the trial court issued a judgment entry reaffirming the magistrate's decision, indicating it reviewed the factors in R.C. 3109.04(F) and reviewed the evidence presented at hearing. The trial court held that, based on the record and evidence presented, it was in the child's best interest for

visitation with Appellant to be suspended. It granted paternal grandmother visitation with the child but Appellant was not to be present during this visitation. Appellant subsequently filed this timely appeal.

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ABUSED ITS DISCRETION BY EFFECTIVELY TERMINATING THE PARENTAL RIGHTS OF APPELLANT IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE.

ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ABUSED ITS DISCRETION IN MISAPPLYING THE CLEAR AND CONVINCING STANDARD OF PROOF REQUIRED TO ORDER TERMINATION OF PARENTAL RIGHTS.

**{¶15}** In his first and third assignments of error Appellant contends the trial court terminated his parental rights without clear and convincing evidence that he sexually abused the minor child. Essentially, Appellant argues that since his visitation rights have been suspended since May of 2014, he has had his parental rights terminated without the appropriate evidentiary basis for such an action.

**{¶16}** Appellant's arguments regarding his status are misguided. Although he clearly has had his visitation rights suspended, he has not had his parental rights terminated, nor is this a case where termination of these rights could occur.

**{¶17}** An abuse of discretion standard is used to review a trial court's decision regarding visitation. See *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1988). A trial court abuses its discretion when it issues a judgment that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d

Case No. 17 BE 0034

217, 219, 450 N.E.2d 1140 (1983). Appellant contends the trial court abused its discretion by terminating his parental rights without clear and convincing evidence.

**{¶18}** The primary focus of any visitation order is the best interest of the child. *Kelm v. Kelm*, 92 Ohio St.3d 223, 226, 749 N.E.2d 299 (2001). "A trial court may limit or restrict visiting rights of a party in order to further the child's best interest." *Callender v. Callender,* 7th Dist. No. 03-CA-790, 2004-Ohio-1382, at ¶ 31. The trial court possesses the "power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." *Id.* quoting *Anderson v. Anderson,* 147 Ohio App.3d 513, 2002-Ohio-1156, 771 N.E.2d 303, at ¶ 18.

**{¶19}** As a preliminary matter, both the trial court and Appellant refer to R.C. 3109.04(F) which relates to the modification of parental rights and responsibilities and provides the factors to be considered in determining whether a modification of parental custody is in the best interest of the child. See R.C. 3109.04(F)(1)(a) – (j). The test set forth in R.C. 3109.04(E)(1)(a) is used when a party is seeking to "modify a prior decree allocating parental rights and responsibilities." This statute does not govern modification of the visitation schedule of a non-residential parent. R.C. 3109.051(C) does govern parental visitation, and requires an analysis of only the best interest of the child.

**{¶20}** The Ohio Supreme Court confirmed the "modification of visitation rights is governed by R.C. 3109.051, and * * * the specific rules for determining when a court may modify a custody decree as set forth in R.C. 3109.04 are not equally applicable to modification of visitation rights." *Braatz v. Braatz*, 85 Ohio St.3d 40, 44-45, 706 N.E.2d

Case No. 17 BE 0034

1218 (1999). The statutory reference to modification of parental rights and responsibilities relates directly to custody and control and not to visitation. *Id.* at 43. Because visitation does not involve custody, modification of parental visitation is only subject to a best interest of the child analysis. *Id.* at 45.

{¶21} Pursuant to R.C. 3109.051(D), in determining parenting time matters the trial court shall consider all of the following factors: (1) the prior interaction and interrelationships of the child with the child's parents, siblings and other persons related by consanguinity or affinity; (2) the geographical location of the residence of each parent and the distance between them; (3) the child's and parent's available time for visitation, including the parents' employment schedules, the child's school schedule and holiday and vacation schedules; (4) the age of the child; (5) the child's adjustment to home, school and community; (6) any wishes and concerns the child expressed to the court; (7) the health and safety of the child; (8) the amount of time that will be available for the child to spend with siblings; (9) the mental and physical health of all parties; (10) each parent's willingness to reschedule and accommodate the other parent's parenting time; (11) prior convictions for certain offenses or acts resulting in abuse or neglect; (13) whether a parent has willfully and continuously denied parenting time rights; (14) whether either parent has or is planning to establish a residence outside the state; and (16) any other factor in the best interest of the child. Factors (12) and (15) relate only to persons other than parents who are seeking visitation and are inapplicable here. R.C. 3109.051(D).

{¶22} It is clear from the record that the trial court explicitly considered the factors and issues enumerated in R.C. 3109.04(F)(1) and did not consciously apply the

R.C. 3109.051(D) factors. The two statutes contain similar provisions, including consideration of the child's prior interactions with her parents and siblings; the child's adjustment to each parent's home and community; and the general catch-all provision which provides for consideration of any other relevant factor. There are factors within R.C. 3109.051 which are not contained within R.C. 3109.04(F).

{¶23} In considering Appellant's arguments on appeal, we apply the appropriate statute addressing modification of parental visitation. We have held that even when, as here, the trial court cites the wrong statute as the basis for its determination, if the record reveals that the appropriate factors actually were considered, the trial court's judgment on visitation matters will be affirmed. *Campana v. Campana,* 7th Dist. No. 08 MA 88, 2009-Ohio-796, ¶ 51.

{¶24} In the case at bar, there were three days of hearing. The lengthy magistrate's decision dated June 30, 2016, carefully sets forth a review of the testimony, documentary evidence and R.C. 3109.04(F) factors. The court specifically considered the physical and mental health of all parties, including the reports submitted by the child's therapist and the psychiatric evaluation submitted by Appellant. The court considered the relationship of the child with each parent, including testimony from the GAL and the child's counselor that the child was traumatized and feared her father. The court also considered the criminal history. While there were no convictions for domestic violence or abuse as of the date of the hearings, the court noted that the child's allegations of sexual abuse had been substantiated by the children service agency. Regarding any other best interest factors, the court found that the GAL recommended Appellant's visitation be suspended and that this recommendation was confirmed in the

Case No. 17 BE 0034

affidavits from the child's counselor and the social worker from the service agency. Finally, the court appears to have given no evidentiary weight to any of the three polygraph tests, despite Appellant's lengthy discussion of them in his brief.

**{¶25}** We have recognized that the trial court need not provide an exhaustive laundry list of factors considered but must demonstrate a thoughtful consideration of the relevant factors. And as earlier stated, we have upheld the trial court's judgment on visitation even when the court mistakenly cited the wrong statute, so long as the record demonstrates the court did consider the relevant factors in reaching its determination. *Troyer v. Troyer,* 188 Ohio App.3d 543, 2010-Ohio-3276, 936 N.E.2d 102, ¶ 36 (7th Dist.); *Campana, supra.* In the case *sub judice*, although the magistrate cited to the wrong statutory factors, a review of the entire magistrate's decision reveals the court made a thorough, thoughtful inquiry into every aspect of the child's life relative to visitation with Appellant. That inquiry clearly relied on several factors enumerated in R.C. 3109.051(D). Under the totality of these circumstances, citation to R.C. 3109.04 is harmless error, as the court's review consisted of the careful scrutiny of factors necessary in order to make a determination on visitation. Therefore, Appellant's first and third assignments of error are without merit and are overruled.

ASSIGNMENT OF ERROR NO. 2

BOTH THE TRIAL COURT AND THE JUVENILE COURT ARBITRARILY ASSIGNED VALUE TO ONE OF THREE POLYGRAPHS ADMINISTERED TO APPELLANT, CHOOSING TO DETERMINE ONE TEST AS "MOST RELIABLE", WHILE DISCOUNTING TWO OTHER POLYGRAPH EXAMINATIONS.

{¶26} In his second assignment of error, Appellant contends the trial court erred in determining that one of the three polygraph examinations of Appellant was more reliable than the others.

{¶27} In *State v. Souel,* 53 Ohio St.2d 123, 372 N.E.2d (1978), the Ohio Supreme Court held that polygraph examination results are admissible in a criminal trial for purposes of corroboration or impeachment provided four conditions are met. *Id.* at the syllabus. While the present matter does not involve a criminal conviction, because criminal matters require more stringent rules covering admissible evidence, it is instructive to review polygraph tests in that light. In the context of criminal matters, in order for a polygraph examination to be admissible the following conditions must be met:

(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

(a) the examiner's qualifications and training;

(b) the conditions under which the test was administered;

(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,

(d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.

*Id.* at syllabus.

**{¶28}** Again, although the reasoning in *Souel* was developed in the criminal context and visitation is a civil matter, it is worth noting that all the requirements enumerated in *Souel* were met here. Each examiner was present at hearing to testify on direct and cross-examination as to their respective training and qualifications, test conditions, and the limitations and possibility for error in the examination. Both parties stipulated to the admission of the polygraph examinations. Further, the trial court noted in its final judgment entry that the polygraph examinations carried almost no evidentiary value. As such, we find the trial court did not abuse its discretion in determining that one examination appeared to be more reliable than the others. The trial court recognized the inherent reliability issues with polygraph examinations as indices of truth or falsehood in general, and indicated in the written judgment entry that none of the examinations were considered to contain reliable indicators. The trial court did not

abuse its discretion in its ruling on the polygraph examinations. Therefore, Appellant's second assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT'S FINDINGS OF FACT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶29}** In his fourth assignment of error, Appellant argues that the trial court's determination on the suspension of his visitation is against the manifest weight of the evidence.

**{¶30}** "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. In considering a challenge to the manifest weight of the evidence, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re A.S.,* 7th Dist. No. 11 JE 29, 2012-Ohio-5468, ¶ 10.

**{¶31}** In weighing the evidence, a reviewing court must be mindful of the presumption in favor of the finder of fact. *Id.* In determining whether the trial court's decision is manifestly against the weight of the evidence, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is

consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*

**{¶32}** Appellant lists a number of evidentiary issues which he feels demonstrates error on the part of the trial court, including: (1) testing of the child's shoes came back negative for semen or creatinine despite the child's statement that "Downtown" "peed" in her mouth and some of the fluid fell on her shoes; (2) the child referred to more than one individual as "daddy," therefore, Appellant was not clearly identified; (3) a psychiatric evaluation obtained by Appellant did not indicate that he was a sexual predator; and (4) the GAL did not specifically state that Appellant was the perpetrator of the abuse.

**{¶33}** Appellant concedes that a thorough investigation of the child's claims was undertaken and urges as highly important that testing of the child's shoes failed to corroborate the child's assertion that bodily fluids fell onto her shoes. The shoes were submitted to BCI by Allar for testing. The report submitted at hearing indicated that the shoes tested negative for both semen and creatinine. While this test result does not corroborate the child's statements made to her counselor that her abuser "peed" on her shoes, this is simply one small piece of the evidence in the instant matter and is not conclusive as to the overall veracity of the child's assertions. The magistrate did acknowledge that forensic testing of the child's shoes came back negative for body fluids. The magistrate also acknowledged throughout the extensive decision that there were several other indices of the truthfulness of the child's disclosures of abuse.

**{¶34}** Appellant next contends that because the child called several individuals "daddy," any reference to "daddy" by the child does not implicate him. He mistakenly

argues that the child never identified him as the perpetrator of her abuse. Appellant is correct that the child initially referred to her abuser as "Downtown." Approximately six months after the initial disclosure, the child indicated to her counselor that "Downtown" was "daddy". (Steele Depo., Exh. 4A, p. 46.) Thereafter the child revealed that "daddy" was Appellant. Her statements remained constant and unwavering as to the identity of her abuser and that it was Appellant. In her interview with Albert on May 14, 2014, the child revealed the identity of the perpetrator was Appellant. (4/17/15 Tr., p. 223.) Albert stated that during each of her sessions, the child referred to her stepfather as Aaron and called Appellant by his first name. (4/17/15 Tr., p. 223.) Importantly, every professional associated with the investigation after the child's first disclosure revealed that the child was afraid of Appellant and would become extremely upset and fearful at the prospect of being left in his care. The GAL stated in his report that it was clear the child had experienced trauma while in Appellant's care and that she was afraid of him. She discussed stories of her abuse with no prompting from the GAL, and it did not appear to the GAL that the child had been coached in any way. The affidavits supplied by her counselor, Albert, as well as the intake specialist from the Belmont County Children Services Agency both contained references that the child was afraid of her father and opined that he should be prevented from having further visitation. The record is also replete with evidence that the child was oversexualized for her age and exhibited an erratic change in behavior after visitation with Appellant. Thus, despite Appellant's assertion that the child never specifically created a link from "Downtown" to "daddy" to Appellant himself, it was clear to the counselors that the child was fearful of Appellant and that Appellant was the perpetrator.

**{¶35}** Appellant also places significant importance on his psychiatric evaluation, which indicated he was not a sexual predator. Dr. Robert Miller, a psychiatrist hired by Appellant, testified at hearing and submitted a 12-page report regarding his evaluation of Appellant. Miller was hired by Appellant to do what was termed a "quality of parenting" evaluation and submitted Appellant to a number of tests, including a personality test. (2/27/15 Tr., p. 163.) Miller read the conclusion of his report into the record:

> This evaluation did not demonstrate that [Appellant] has any current cognitive or psychological/psychiatric deficits that would be predicted to impair his capacity to parent his child[.]

(2/27/15 Tr., p. 177.)

**{¶36}** Miller also testified, as noted in the magistrate's decision, that Appellant "may not have been completely truthful in his evaluation in order to appear 'virtuous' regarding sexual fantasies." (6/30/16 Magistrate Decision, p. 2.) Miller gave testimony about the type of counseling the child may have been receiving but acknowledged that he had never met the child or the child's mother. *Id.* In reviewing Miller's entire testimony and report, Miller stated that Appellant's testing "may be consistent with a person who may have difficulty responding truthfully to others" and that Appellant's testing indicated he "never had a sexual fantasy" but that Appellant may have been "trying to look good" during the assessment. (2/27/15 Tr., pp. 181-182.) Thus, while Miller indicated that Appellant did not have current "cognitive or psychological/psychiatric deficits" following testing, he also indicated that Appellant was not being truthful during testing.

Case No. 17 BE 0034

**{¶37}** Finally, Appellant cites to the GAL reports and states that as the GAL did not specifically name him as the perpetrator of the abuse his visitation should not have been suspended. The GAL submitted two reports in this matter. Both show that the GAL was not positive that Appellant was the actual perpetrator of the acts. However, in both reports the GAL strongly states the child had clearly suffered trauma while in Appellant's care and that her allegations of abuse remained consistent and did not appear to be the product of coaching. Both reports also strongly recommended that Appellant's visitation be immediately suspended due to the child's intense fear of her father and evidence that she was oversexualized and spoke in great detail about the abuse she suffered while in his care and under his supervision. Whether Appellant was the direct perpetrator of the abuse or not, the GAL stated that the child had certainly suffered from abuse while in his care.

**{¶38}** Based on the foregoing, mindful of the presumption in favor of the finder of fact's interpretation of the evidence, particularly where it may be contradictory, we conclude that the trial court's decision was not against the manifest weight of the evidence. The child's counselor, the children services intake manager and the GAL all testified that the child had suffered trauma while under Appellant's care and that it was in her best interest that Appellant's visitation be suspended. The testimony, affidavits and other documentary evidence clearly indicate the child was traumatized and extremely fearful of her father. Thus, Appellant's fourth assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 5</u>

THE RULING OF THE TRIAL COURT IS AN ABUSE OF DISCRETION VIOLATING THE APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE 14TH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

**{¶39}** In his last assignment of error, Appellant argues that the trial court essentially terminated his parental rights, which amounted to a violation of his due process. We have already stated that the trial court did not terminate Appellant's parental rights, but did suspend his visitation. As noted, the trial court possesses the power to restrict the time and place of visitation or to deny visitation rights altogether if visitation would not be in the best interest of the child. *Anderson v. Anderson,* 147 Ohio App.3d 513, 2002-Ohio-1156, 771 N.E.2d 303, at ¶ 18. Appellant attempts to reconfigure the court's decision as a termination of parental rights, which is an entirely different proceeding. Modification of parental visitation, as codified in R.C. 3109.051, requires an analysis of the best interest of the child to determine whether a parent's visitation time should be modified or even denied. *Id.* Palmer testified at hearing that the child's disclosure of abuse was substantiated by the intake counselor at the Belmont County Children Services. Ordinarily this would trigger intervention by the agency, but a petition for termination of parental rights pursuant to R.C. 2151.413 was not filed because the child was in the mother's care and custody. (Tr., pp. 261, 284, 285.) Appellant's constitutional rights are not implicated in a parental visitation matter pursuant to R.C. 3109.051. The trial court did not err in modifying Appellant's visitation, and although visitation with Appellant has been suspended, this record reflects that his parental rights were not terminated. We also note that although the trial court

Case No. 17 BE 0034

suspended Appellant's visitation with his child, it did not issue a no-contact order. Although Appellant is prohibited from physical visitation and from being present while his mother, the child's grandmother, continues to exercise her visitation, there is no prohibition against Appellant making telephone calls, sending gifts, or otherwise maintaining some contact with his daughter. Additionally, as the trial court retains continuing jurisdiction, Appellant is able to seek an order of visitation through the trial court at some future date. Because Appellant's parental rights were not terminated here, Appellant's fifth assignment of error is without merit and is overruled.

## Conclusion

{¶40} Based on the foregoing, we find that Appellant's assignments of error have no merit and affirm the judgment of the trial court suspending Appellant's parental visitation.

Donofrio, J., concurs.

Robb, P.J., concurs.

[Cite as *In re: F.B.*, 2018-Ohio-2488.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Belmont County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**